## Case No. 5,060.

The FRANK MOFFAT.

[2 Flip. 291; [1] 11 Chi. Leg. News, 114.]

District Court, E. D. Michigan. Nov. Term, 1878.

[1] [Reported by William Searcy Flippin, Esq., and here reprinted by permission.]

F. H. Canfield, for libellant.
Geo. E. Halliday, for respondent.

BROWN, District Judge. I am satisfied there is no fault to be imputed to the schooner. The line connecting her with the tug was only 120 to 125 feet in length, and as the tug did not check until very close to the propeller, the utmost vigilance and activity on the part of the schooner in porting, would not have enabled her to clear the propeller. There is no evidence that any warning was given by the tug, although the mate swears that he thinks he told the watchman to go and sing out to them. With a longer line and with an earlier observation of the propeller on the part of the tug, the schooner might have ported in time to avoid her, but, under the circumstances of the case, it was obviously impossible.

It is also claimed that the tug was acting simply as the agent of the schooner, and that the schooner is solely responsible for the negligence of the tug. There are a number of English cases cited, as lending countenance to this doctrine, but upon a careful examination, I find they do not sustain it to the extent claimed. In The Duke of Sussex, 1 W. Rob. Adm. 270, the action was brought against a tug for damage occasioned by the vessel in tow colliding with another vessel. It was held that the vessel in tow, having a licensed pilot on board, and no error or negligence being established on the part of the crew of the tug, she could not be held liable. Following the general rule in England, that a vessel is not liable for a collision occasioned by the act of a licensed pilot, it was held that as the steam tug only executed the orders of a pilot on board the vessel, and was guilty herself of no negligence, she could not be held responsible. To the same effect is The Duke of Manchester, 2 W. Rob. Adm. 470. In The Gypsey King, Id. 542, Dr. Lushington states the English law as follows: "Now I have, upon former occasions, already expressed my opinion, that a vessel in charge of a licensed pilot, whilst in tow of a steam tug, is, under ordinary circumstances, to be considered as navigated by the pilot in charge; that if the course pursued by the steam tug is in conformity with his directions, and a collision takes place, the pilot

is responsible, and not the owner of the vessel or of the steam tug. If, on the contrary, the steamer disregard the directions of the pilot, and the collision was occasioned by her misconduct, the owners of the ship would, in that case, be responsible in this court, as for the act of their servant; and they must seek their redress against the owner of the steam tug in some other action."

There is no case. however, even in England, holding directly that a steam tug. controlled by her own officers and men, would not be liable if she herself were guilty of negligence in bringing about the collision. In the case of Smith v. The Creole [Case No. 13,033], the principal American case supposed to support the English doctrine, Mr. Justice Grier observed, "When canalboats or other like vessels are towed by steamboats, it is usually under a contract which puts the towed vessel wholly under the direction and control of the officers of the steamboat. In such cases the steamboat would be liable for any collision occasioned by the negligence or want of skill of her officers, but when the steam power has been hired to tow larger vessels in or out of port, the contract is different, and creates a different state of responsibility. The towboat in such case, is the servant of the ship, and in the exercise of its physical power, is bound to obey the orders of the master or pilot who has command or control of the ship. If the towboat obeys the directions of the pilot or the master of the vessel, he is responsible for the consequences. If the ship is brought into collision with another vessel, by the unskillfulness or disobedience of orders of the officers or hands on the towboat, its owners are liable to the owners of the vessel or person who employed them, but not to third parties."

I think this and later cases, holding the principal responsible instead of the servant, proceed upon the hypothesis that the negligent act on the part of the tug was committed in obedience to orders from the officers of the ship, and are not founded upon the general relation between them of master and servant.

The rule which governs this case is laid down in Sturgis v. Boyer, 24 How. [65 U. S.] 123, and repeated in The Maria Martin. 12 Wall. [79 U. S.] 44, in the following language: "Where the officers and crew of the tow. as well as the officers and crew of the tug participate in the navigation of the vessel, and a collision with another vessel ensues, the tug alone, or the tow alone, or both jointly. may be liable for the consequences, according to the circumstances, as the one or the other or both jointly were either deficient in skill, or culpably inattentive or negligent in the performance of their duties. See, also, The John Frazer, 21 How. [62 U. S.] 184; Sproul v. Hemmingway, 14 Pick. 1; The Belknap [Case No. 1,244].

As the business of towing is conducted upon the lakes, I regard the relation between the tow and the tug as that of master and servant. The tug engages usually for a lump sum, to tow the vessel from one point to another. She furnishes her own crew, pursues her own course, regulates the length of the line, the movements of the vessels, the order in which the tow shall be made up, and determines the number of the tow, usually irrespective of the wishes of the master of the vessel. It is true, the vessel in tow has certain duties also to perform, she must keep a careful lookout, follow in the wake of the tug, have her lights properly burning at night, and do all she can to avoid a collision in case of danger. In the performance of these services, the tug is plainly a "contractor" within the definition of that word. Shear. & R. Neg. § 87. In such cases each party is responsible for his own negligence. If, by the negligence of the tug, the tow is drawn off her course, the tug is responsible. If, by the negligence of the vessel she sheers out of her course, she is alone liable. It is a case where both participate in the movements of the tow, and both are concerned in its direction. I think all of the cases where the tug has been exonerated, have been those where the act of negligence committed by her was in obedience to an order given by an officer in charge of the vessel. In such case the vessel would clearly be liable and the tug exonerated.

The objection that the lien has been lost by the laches of the libellant, in failing to bring his action within a reasonable time, is untenable. The collision occurred the 16th of November, 1873. and the action was commenced on the 10th of November, 1875; about two years after the cause of action arose. Had the tug in the meantime been sold and passed into the hands of a bona fide purchaser, without notice of this claim. I should have held the lien lost. But where no change of ownership has taken place, I see no reason why the libellant should be debarred of his action if he commence his suit within the time prescribed by the statute of limitations.

The liability of the propeller depends solely upon the question whether she was exhibiting a proper light at the time of the collision. On the one hand her crew swear that the usual anchor light was displayed upon the flagstaff. and that there was also a globe lantern standing upon the companion way in such a position that it could be seen by a vessel approaching from behind; but their testimony is not of the most trustworthy nature, as all but one man seem to have been below at the time of the collision. On the other hand, the master, mate, lookout, and engineer of the tug, all swear that no light was displayed; and two of them, at least, saw the propeller at some distance; were intently watching her to find out what she was, and would certainly have seen a

light if it had been exhibited. I do not think the general rule, that when there is a conflict of evidence with regard to what has taken place upon a vessel, the testimony of her own master and crew shall be believed in preference to that of an equal number of witnesses observing her movements from another vessel, applies to the exhibition of a light. This is a matter about which none of the crew can speak with any certainty, except those who were on deck, and even they might very easily overlook the extinguishment of a light, while the crew of an approaching vessel, keeping a proper lookout, could hardly fail to discern a light, if one exhibited. The night of the collision was a cold one, and I deem it not at all improbable that the oil might have become congealed and the light either have been extinguished or become so dim it could be seen but a short distance off. There is also evidence tending strongly to show that, after the collision occurred, a light was run up on the flagstaff of the propeller—a thing which would probably not have been done had there been a sufficient one already. At the time of the collision, there was also complaint made by the crew of the tug to the master of the propeller, that she was lying there without a light, and some one remarked that it was a pretty time of night to put up a light. Upon the whole, I think the evidence preponderates in favor of the theory that the propeller was not exhibiting a proper light at the time of the collision. While the absence of such a light in a bright moonlight night would probably not have occasioned a collision, considering that the night was a dark one, though not cloudy, I cannot say it did not contribute to the collision in this case. Indeed, I think it very improbable that it would have occurred if a proper light had been exhibited. A fault proven to have been committed is presumed to have contributed to the collision, and the want of a proper light has always been considered a fault of the gravest description. I think it should require a clear case to satisfy the court that it did not aid in bringing it about. The Thomas Lea, 3 Asp. 260; The Victoria, 3 W. Rob. Adm. 49; The Saxonia, Lush. 410; The Olivia, Lush. 497; The Indiana [Case No. 7,020]; The St. Charles, 19 How. [60 U. S.] 108; The Osprey [Case No. 3,763]; Nelson v. Leland, 22 How. [63 U. S.] 55; The Ariadne, 13 Wall. [80 U. S.] 475; 1 Pars. Shipp. 550. I must therefore hold the propeller to have been in fault.

I think the tug was also clearly in fault. The evidence is uncontradicted that the propeller was seen some time before the collision occurred. The mate says: "I could see something looming up before me in the dark. That is the first intimation I had of it. I called the watchman's attention to it and he said it looked like the broadside of a barn. Then I saw that we were getting pretty close to her, and checked her down and stopped her; put my wheel a-starboard. I saw it was my only chance of not striking her. I took it to be a small vessel of some kind, I did not know what. I was so close to her I saw it was the only thing I could do. * * * Not more than half a minute elapsed from the time I saw the Colorado to the time I checked the speed of the tug; maybe not that long. If I had known that it was a propeller, I don't know that there was anything to prevent me from porting my wheel, and clearing her, but I did not have my lights ranged and could not tell, and so I starboarded my wheel. If that had been a vessel sailing up the river I would have put my wheel to starboard."

John Hiller, the watchman, says: "Mr. Edwards called my attention to this black spot, or something dark, it looked to him, and asked me if I knew what it was, and I supposed it to be, when I first saw it, a bunch of rushes. I passed some queer remark about it; said it looked like the side of a barn or something in a joking way, and I stood forward with him; in a few minutes our light shone on the propeller's stern so we could see it, it looked like a sail, the stern did, to me. Mr. Edwards checked the boat down immediately and I made the remark that I thought it was a small boat, a fishing boat or yacht of some kind; it looked like a small sail. Mr. Edwards checked the boat down and put his wheel starboard, and stopped her soon after he checked her, * * * I don't think she could have been more than 100 or 150 feet from the propeller when she was checked down, probably further; I could not say exactly."

John Thomas, the engineer, says: "My first knowledge was a bell rung and I got out of bed to see what was the matter, as I usually do when we go over the flats. I looked out and I could not see anything but a white glimmer, which I thought was a sail, so we checked the engine back very slow. I told the second, he was standing by the engine, to check her slow, and by and by we got a bell to stop, and by that time we ran alongside. * * * It could not have been a very long time after we got the bells to check before we got the bell to stop; I could not tell exactly. It might have been half a minute or it might have been close on a minute for aught I know."

The master of the propeller testifies that the propeller could have been seen three or four lengths of herself without lights. To the same effect is the testimony of the first engineer.

I think it evident from this testimony, that the mate and lookout of the tug must have discovered the propeller very soon after passing the range lights at the bend, and at a distance of from 800 to 1,000 feet. Failing to discover exactly what it was, and mistaking it, perhaps, for a bunch of rushes, it was nevertheless incumbent upon them at once to stop until its character had been de-

termined. If a steamer makes an object or hears a hail ahead of her, the character or position of which the officers are unable to fix, it is their duty to stop until the doubt is resolved. The Hypodame, 6 Wall. [73 U. S.] 216. She has no right to plunge blindly forward and encounter dangers, the magnitude of which she is unable to discern. This applies with even greater force to a tug, since she is unable to back or to use any extraordinary efforts to avoid a collision, without endangering a collision between herself and her tow.

I think it quite probable there may have been a mistake in the range lights at the head of the canal, and that not only the starboarding of the tug, but the grounding of the propeller may be attributed to that. Although it is denied by the officers of the propeller, it is perhaps the most probable solution of her getting aground, and of the otherwise inexplicable movement of the tug. But the question of fault does not hinge upon this. It was the duty of the tug at once to stop when she made out the dark object ahead of her. Instead of this, she kept on for some considerable time, and apparently did not even check until the lights of the tug reflected back from the stern of the propeller, developed the fact that it was a vessel. The tug then first checked. Even then, prompt porting might have avoided the collision. Certainly the tug cannot claim the excuse of a wrong order given in a moment of imminent peril, since by her negligence in failing to stop, she had brought herself into that predicament. There must be a decree apportioning the damages, and referring it to a commissioner to assess and report the same.